**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

**FILED MAY 11, 2005**

SHARDA GARG,

    Plaintiff-Appellee/Cross-Appellant,

v                                                          No. 121361

MACOMB COUNTY COMMUNITY MENTAL HEALTH SERVICES,

    Defendant-Appellant/Cross-Appellee.

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider whether there was sufficient evidence to support plaintiff's claims of retaliatory discrimination and whether the "continuing violations" doctrine of *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505; 398 NW2d 368 (1986), should be preserved, modified, or abrogated in light of the language of the statute of limitations, MCL 600.5805(1). The jury found that plaintiff was not discriminated against on the basis of national origin, but was retaliated against on the basis of either her opposition to sexual harassment or because she filed a grievance claiming national-origin

discrimination. The Court of Appeals affirmed. Because we conclude that, once evidence of acts that occurred outside the statute of limitations period is removed from consideration, there was insufficient evidence of retaliation based on either plaintiff's alleged opposition to sexual harassment or her filing of a grievance, we reverse the judgment of the Court of Appeals and remand to the trial court for entry of a judgment in favor of defendant. In so holding, we overrule the "continuing violations" doctrine of *Sumner, supra,* as inconsistent with the language of the statute of limitations, MCL 600.5805(1) and (10). As a result, we do not reach the other issues raised on appeal or the issues raised in plaintiff's cross-appeal.

## I. Facts and Procedural History

Plaintiff Sharda Garg is of Asian Indian ancestry. She began her employment as a staff psychologist with defendant Macomb County Community Mental Health Services in 1978. Plaintiff testified that Donald Habkirk, the director of defendant's disability section, which included the facility where plaintiff worked, had during 1981 engaged in what plaintiff characterized as "sexually harassing" behavior with female coworkers. Specifically, plaintiff observed Habkirk pull one coworker's bra strap and snap the elastic panties of another. Plaintiff

acknowledges that she herself was never treated in this manner or otherwise sexually harassed, and that she never reported to anyone the incidents she allegedly observed. Habkirk denied engaging in such conduct.

At "around the same time," plaintiff, while walking down an office corridor, felt someone's hand touch her upper back, near her shoulder. Plaintiff reacted as follows: "I felt somebody touching me, and I just turned around and swung at him." She further observed, "it was a very automatic reaction on my part." It was only after she hit this person that she realized it was Habkirk whom she had hit. She and Habkirk stared at each other for a moment before she proceeded into her office. Plaintiff did not file a grievance, tell anyone about the incident, or offer any explanation to anyone regarding why she had struck Habkirk. In response to a question concerning whether the touching was "improper," plaintiff did not characterize it as such.

While Habkirk never took any formal action against plaintiff for striking him, and indeed testified that he could not even remember the incident, plaintiff claims that her formerly cordial relationship with Habkirk deteriorated as he became increasingly cold and distant. While plaintiff generally enjoyed a good employment relationship with defendant and its management initially, she asserted

that she began to perceive changes in this relationship following the touching incident. After six years of being rated as either "outstanding" or "very good," plaintiff's 1983 performance review was downgraded to "satisfactory." It was also at this point that plaintiff applied for several job promotions, in each case unsuccessfully. The first position she applied for in 1983 was given to someone from outside the organization, despite a general inclination by defendant in favor of internal promotions. Two other promotion applications in 1983 were also rejected. Over the next three years, plaintiff applied unsuccessfully for four more promotions. Plaintiff was denied a total of eighteen promotion opportunities, including eleven during the period of 1983 through 1987. During this period, Habkirk always served in plaintiff's chain of command. Once at a dinner party with plaintiff's immediate supervisor, Robert Slaine, plaintiff's husband asked why plaintiff had not been promoted. Slaine responded that, in his opinion, it was because Habkirk did not like plaintiff. Slaine denied making this statement, and Habkirk denied telling Slaine that he disliked plaintiff.

In 1986, Kent Cathcart was chosen by Habkirk as the new program director in plaintiff's facility. However, little changed for plaintiff because she failed to receive

any of the next three promotions for which she applied. In December 1986, she was denied a promotion in favor of a contract employee with less seniority. Following this rejection in February 1987, plaintiff filed her first promotion-related grievance with the union representing defendant's employees. When plaintiff was again denied a promotion in early 1987, this time in favor of a person from outside the company, she filed a second promotion-related grievance with the union in June 1987, alleging that the denial was due to discrimination based on her national origin and color. The grievance was forwarded to Cathcart, and was denied without investigation. Plaintiff next applied for a promotion in 1989, but was again denied. Plaintiff was denied seven promotions during the period of 1989 through 1997.

Plaintiff claims that the "retaliation" against her for filing these grievances also took the form of poor overall treatment by defendant. Specifically, she claims that Cathcart, and the two supervisors who succeeded Cathcart after plaintiff was transferred to defendant's First North facility in 1995, treated her "in a degrading and humiliating manner." Plaintiff claims that Cathcart would criticize her for not participating in agency activities, but would then deny her requests to participate in meetings, conferences, and committees. In addition,

5

plaintiff testified that Cathcart would reprimand her for being even two minutes late for work, but would let her coworkers "come and go as they pleased." Plaintiff also testified that Cathcart once chastised her for going outside to look at a rainbow, but that her coworkers were routinely allowed to go outside for cigarette breaks on company time. Cathcart also refused to give her keys to the facility. Finally, when she moved to First North, plaintiff was given an office that was formerly a storage closet. The office was uncarpeted and had no windows. In addition, it was located next to a bathroom, forcing plaintiff to hear "people defecating and urinating" throughout the day. Plaintiff was assigned to this office despite her seventeen years of seniority and the availability of more desirable office spaces.

Plaintiff also claims that Cathcart demonstrated a predisposition against "people of color" during the period that she was employed by defendant under his supervision. Specifically, plaintiff testified regarding four separate displays of this predisposition. First, when Cathcart learned that plaintiff's son had been accepted to medical school, he allegedly stated that "there are enough Indian doctors already." Second, Cathcart allegedly complained about the accent of an Indian psychiatrist, stating that "these people have been here long enough, they ought to

**6**

speak good English." Third, Cathcart allegedly stated that he would not have hired an African-American nurse if a white candidate had been available. Finally, Cathcart allegedly used a racially derogatory term when referring to African-Americans. Cathcart denies making any of these statements.

On July 21, 1995, plaintiff brought this action under the Civil Rights Act, MCL 37.2101 *et seq.*, claiming that her promotion denials and poor treatment were due to national-origin discrimination and were in retaliation for engaging in activities protected by the act. Plaintiff originally claimed retaliatory discrimination based solely on the union grievance claiming national-origin discrimination. She later amended her complaint to allege that she was also retaliated against for opposing sexual harassment. Defendant denied the allegations and asserted that some of the allegations were barred by the three-year period of limitations. MCL 600.5805(1) and (10). Defendant moved for partial summary disposition on that basis, but the trial court denied the motion, citing the "continuing violations" doctrine adopted in *Sumner*.

Following a three-week trial, the jury found that plaintiff was not discriminated against because of national origin or color. However, the jury also found that defendant had retaliated against plaintiff because she

"opposed sexual harassment or because she filed a complaint or charge about being discriminated against." The jury awarded plaintiff $250,000 in damages.

Defendant filed a motion for judgment notwithstanding the verdict or a new trial. The trial court noted that "physical acts can convey a message better than words," and that plaintiff's physical response to the touching by Habkirk was sufficient to inform defendant that she opposed Habkirk's sexually harassing behavior. The trial court further held that sufficient evidence was presented to allow a reasonable juror to find a causal connection between plaintiff's striking Habkirk and her failure to be promoted. Because the evidence supported at least one of the retaliation theories, defendant's motion was denied. In an unpublished opinion, the Court of Appeals affirmed the jury's verdict. Unpublished opinion per curiam of the Court of Appeals, issued March 29, 2002 (Docket No. 223829). The Court of Appeals held that the "continuing violations" doctrine allowed the introduction of factual allegations going back more than three years before plaintiff filed her lawsuit and thus the statute of limitations was not a bar to the facts plaintiff presented to the jury. With regard to the merits, the Court of Appeals held that when plaintiff struck Habkirk, a reasonable juror could have concluded that she "'raise[d]

**8**

the specter,'" quoting *Mitan v Neiman Marcus*, 240 Mich App 679, 682; 613 NW2d 415 (2000), that she was opposing Habkirk's sexual harassment. The Court of Appeals also determined that there was sufficient evidence to allow a reasonable juror to conclude that plaintiff established both of her retaliation claims.

After this Court directed the parties to present oral argument on whether to grant leave to appeal or take other action permitted by MCR 7.302(G)(1), 469 Mich 983 (2003), and having heard such argument, we granted defendant's application for leave to appeal, directing briefing regarding whether the "continuing violations" doctrine of *Sumner* was consistent with the statute of limitations, MCL 600.5805(1). 469 Mich 1042 (2004).

## II. Standard of Review

The denial of a motion for judgment notwithstanding the verdict is subject to review de novo. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003). Reversal is permitted only if the evidence, while viewed in a light most favorable to plaintiff, fails to establish a claim as a matter of law. *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000). Whether the "continuing violations" doctrine is consistent with MCL 600.5805(1) and (10) is a question of law that we

**9**

review de novo. *Jenkins v Patel*, 471 Mich 158, 162; 684 NW2d 346 (2004).

### III. Analysis

The issue in this case is *not* whether plaintiff was treated poorly or insensitively by defendant. Nor is it whether defendant "retaliated" against plaintiff for her conduct in hitting Habkirk. Instead, the issue is whether defendant retaliated against plaintiff *specifically* for conduct on her part protected by the Civil Rights Act. MCL 37.2701 provides, in pertinent part:

> Two or more persons shall not conspire to, or a person shall not:
>
> (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

To establish a prima facie case of retaliation, a plaintiff must show:

> (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. [*DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 436; 566 NW2d 661 (1997).]

#### A. Retaliation Based on Opposition to Sexual Harassment

Plaintiff's first theory is that defendant retaliated against her because she opposed Habkirk's sexual

**10**

harassment. At "around the same time" that plaintiff allegedly observed sexually harassing behavior by Habkirk toward female employees, she felt someone touch her on the back, near her shoulder, while she was walking near Habkirk's office.[1] Plaintiff testified that "I felt somebody's hand touching me, and I turned around and hit the person." She noted further that "it was a very automatic reaction on my part. I felt somebody touching me, and I just turned around and swung at him."

We conclude there is insufficient evidence for a juror reasonably to conclude that by striking Habkirk under these circumstances plaintiff was opposing sexual harassment, i.e., engaging in a "protected activity" under the Civil Rights Act. First, plaintiff acknowledged that Habkirk was not sexually harassing her at the time she hit him so that it is difficult to view her conduct as responsive to "protected activity." This is underscored by plaintiff's acknowledgment that Habkirk had *never* sexually harassed her. Second, there is no evidence that, before this lawsuit, plaintiff ever sought to cast her conduct in

---

[1] Plaintiff argued at oral argument before this Court that it was significant that she was passing a room Habkirk had just occupied, because it demonstrates that she "knew" it was Habkirk who touched her. However, she testified several times that she felt "somebody" touch her back, that she "*didn't know* who was in behind [her]," and that she simply "swung at *whoever it was* behind [her]." (Emphasis added.)

**11**

hitting Habkirk in terms of opposing sexual harassment at defendant's workplace. Such a message was never communicated to the alleged victims of Habkirk's sexual harassment or to fellow employees, much less to Habkirk, management, union representatives, or public agencies. Third, plaintiff testified that she did not even know it was Habkirk who touched her shoulder until after she struck him. That is, because plaintiff in her "automatic" response to the touching could just as likely have struck out at any one of her coworkers as at Habkirk, it is difficult to conclude that her action was somehow intended to communicate a principled opposition to prior incidents of supervisory misconduct. That is, there is simply no connection here between cause—the alleged sexual harassment—and effect—plaintiff's striking Habkirk.[2]

Moreover, although it is not necessary to our analysis in this case, even if plaintiff were indisputably responding to past sexual harassment by hitting Habkirk, we are not prepared to conclude that *any* response to conduct

---

[2] This lack of connection is underscored by plaintiff's own testimony that the incidents of sexual harassment that allegedly prompted her opposition occurred only at "about the same time" that she struck Habkirk. Although we acknowledge that a reasonable juror would be entitled to conclude that this characterization is compatible with incidents of sexual harassment *preceding* plaintiff's hitting Habkirk, the lack of a clear temporal relationship between the cause and the effect does not well serve plaintiff's argument.

prohibited by the Civil Rights Act, no matter how excessive or inappropriate the response, including assaultive behavior, falls within the act's protections. An employee is not immunized for any type of responsive conduct, no matter how outrageous or disproportionate, simply because it is connected with opposition to discrimination. Obviously, no employee would be protected under the act from all "retaliation" by an employer for criminal, or sabotaging, or destructive activities simply because these occurred in response to perceived employer discrimination. For purposes of analysis under § 701(a), consideration must be given to separating the motivation underlying an employee's conduct and the means by which such motivation is translated into conduct.

Under these circumstances, we conclude that no juror could have reasonably concluded that defendant was engaged in a "protected activity" by opposing sexual harassment when she hit Habkirk.

Even if the jury here were persuaded that plaintiff was engaged in a "protected activity" by striking Habkirk, she has failed to show that *defendant knew* that she was engaged in such activity. Absent such a showing, there could be no "retaliation" on the employer's part to anything within the protection of the Civil Rights Act. While Habkirk obviously would have been aware that

13

plaintiff had struck him, there was nothing inherent in this conduct that would have apprised him that plaintiff was thereby opposing sexual harassment. There is no evidence that Habkirk touched plaintiff at that time (or any other time) in a way that was inappropriate; there is no evidence that plaintiff herself perceived that Habkirk touched her in a way that was inappropriate; there is no evidence that Habkirk reasonably could have discerned from the nature of plaintiff's response to his touching that she was communicating any message of opposition to sexual harassment; and there is no evidence that plaintiff at any time explained the "significance" of her behavior to Habkirk.

Nor is there anything else on the part of plaintiff following this incident that would communicate to anyone how she had been opposing sexual harassment by striking Habkirk. To the extent that she failed to communicate this supposed purpose to alleged victims of Habkirk's previous conduct, to coemployees, to management, to union representatives, to public authorities, or to Habkirk himself,[3] it is difficult to understand how defendant could have been sufficiently aware that plaintiff was engaged in

_____

[3] Nor did plaintiff discuss Habkirk's alleged inappropriate behavior itself with any of these parties.

**14**

"protected" activity so as to be able to "retaliate" against her for such conduct.

Under these circumstances, we conclude that no juror could reasonably have concluded that defendant was aware that plaintiff had been engaged in "protected activity" by opposing sexual harassment when she hit Habkirk.

Therefore, on the basis either that there is insufficient evidence that plaintiff was engaged in protected activity[4] or that defendant could have been aware of such activity, plaintiff has failed to establish a claim under the Civil Rights Act. To the extent that she has failed to present sufficient evidence that she was engaged in protected activity, she has failed to satisfy the threshold requirement for coverage under § 701(a); to the extent that she has failed to present sufficient evidence that defendant could have been aware of such activity, she could not have been the object of "retaliation" under § 701(a).[5]

---

[4] We do not agree with the Court of Appeals that plaintiff here has raised any specter that she was engaged in opposition to sexual harassment by her conduct.

[5] Had plaintiff presented sufficient evidence with regard to these matters, i.e., shown both that she had been engaged in a protected activity and that defendant had been aware of this, she would still have been required to demonstrate that she suffered an adverse employment action *as a result of* her engaging in the protected activity, i.e., that there was some nexus or causal connection

15

## B. Retaliation Based on Filing a Grievance

Plaintiff's second theory is that defendant retaliated against her after she filed a grievance claiming national-origin discrimination. After being refused a promotion for the eleventh time, plaintiff filed a grievance with her union in June 1987, claiming that she was being denied promotions because of discrimination based on national origin and color. Plaintiff claims that, as a result of filing the grievance, she was denied subsequent promotion opportunities and was subjected to poor treatment in general by Cathcart and the First North supervisors. With regard to this claim, it is undisputed that plaintiff engaged in a protected activity, namely filing a grievance claiming a violation of the Civil Rights Act. In addition, it is undisputed that defendant was aware that plaintiff had engaged in this activity. Plaintiff presented testimony that defendant's retaliatory conduct took place over an eleven-year period, including acts that took place after she filed the instant action on July 21, 1995.

---

between the adverse employment action and the protected activity. See *DeFlaviis*, *supra*; *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003) (applying the antiretaliation provisions of the Whistleblowers' Protection Act, MCL 15.361 *et seq.*). See also *Shallal v Catholic Social Services of Wayne Co*, 455 Mich 604, 617; 566 NW2d 571 (1997) (noting that "'whistleblower statute[s][are] analogous to antiretaliation provisions of other employment discrimination statutes . . .'" [citation omitted]).

**16**

Defendant argues that, pursuant to the three-year period of limitations, any claim based on acts occurring before July 21, 1992, is barred. MCL 600.5805(10). Despite the statute of limitations, both the trial court and the Court of Appeals permitted plaintiff to recover on the basis of untimely acts, or acts occurring before July 21, 1992, under the so-called "continuing violations" doctrine adopted in *Sumner*. We conclude that, absent evidence of these acts, there is insufficient evidence to establish a causal link between the 1987 grievance and any retaliatory acts occurring within the limitations period.

The "continuing violations" doctrine was first addressed by this Court in *Sumner*, *supra* at 510. We began our analysis in that case by stating that it is "appropriate . . . in discrimination cases [to] turn to federal precedent for guidance in reaching our decision." *Id.* at 525. We found particularly helpful the considerations relied on by federal courts in nullifying the statute of limitations in Title VII of the Civil Rights Act of 1964. 42 USC 2000e *et seq*. We described these as follows:

> First, [the Civil Rights Act] is a remedial statute whose purpose is to root out discrimination and make injured parties whole. Second, employees are generally lay people, who do not know that they must act quickly or risk losing their cause of action. An employee may fear reprisal by the employer, or may refer the

17

matter to a union, which may not take any action within the limitation period. Employees may also delay filing their complaints in the hope of internal resolution or simply to give the employer a second chance. Third, and most importantly, many discriminatory acts occur in such a manner that it is difficult to precisely define when they took place. One might say that they unfold rather than occur. [*Sumner, supra* at 525-526].[6]

*Sumner* also found persuasive the United States Supreme Court's decision in *United Air Lines, Inc v Evans*, 431 US 553; 97 S Ct 1885; 52 L Ed 2d 571 (1977). In *Evans*, the United States Supreme Court for the first time addressed the "continuing violations" doctrine that had been created by the lower federal courts in order to overcome the statute of limitations.[7] The employee in *Evans*, a flight

---

[6] While it is not necessary to our analysis in this case, we note that the operation of our statute of limitations at least partially undercuts the significance of the factors cited by *Sumner*. In Michigan, an employee does not have to "act quickly or risk losing their cause of action" under the state Civil Rights Act but has up to three years to assert a claim in contrast to the 180 days allowed under Title VII. This extended period would also presumably accord an employee sufficient time to seek "internal resolution or simply to give the employer a second chance" without endangering her claim. Further, at least some reasonable observers might presume the three-year limitations period accords an employee sufficient time to determine that a discriminatory act has truly "unfolded."

[7] See, e.g., *King v Georgia Power Co*, 295 F Supp 943, 946 (ND Ga, 1968)(holding that "[t]he failure to allege that the complaint was filed with the EEOC [Equal Employment Opportunity Commission] within 90 days of the alleged unfair employment practices is of no importance, for the violations of Title VII alleged in the complaint

attendant with United Air Lines, was fired in 1968 on the basis of a "no marriage" rule that was later found to violate Title VII. She was rehired by the airline in 1972, but was not credited for her pre-1968 service and, therefore, was treated as a new hire for seniority purposes. The employee argued that the airline's refusal to recognize her past service constituted a "present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination." *Id.* at 557. Therefore, she alleged that the "continuing violations" doctrine should be applied to allow her to obtain relief for the now-untimely 1968 firing. However, the United States Supreme Court held that merely demonstrating a "present effect to a past act of discrimination" is insufficient to create a continuing violation. *Id.* at 558. "[T]he emphasis should not be placed on mere continuity; the critical question is whether any present violation exists." *Id.* Therefore, in order to support a discrimination claim on a "continuing violations" theory, an employee must first demonstrate the existence of a present violation. Since the employee in *Evans* was unable

---

may be construed as 'continuing' acts"); *Bartmess v Drewrys USA, Inc*, 444 F2d 1186, 1188 (CA 7, 1971) (holding that "the ninety day limitation is no bar when a continuing practice of discrimination is being challenged rather than a single, isolated discriminatory act").

to demonstrate any violation within the time limitations of Title VII, her claim was barred as untimely.

*Sumner* found the federal precedent persuasive and held that the "continuing violations" doctrine applied to claims under both the Civil Rights Act and the Handicappers' Civil Rights Act, MCL 37.1101 *et seq.* This Court adopted the *Evans* requirement that an employee must first demonstrate that a violation has taken place within the limitations period. *Sumner*, *supra* at 536. Once an employee has demonstrated this, he or she must then demonstrate either that his or her employer has engaged in a "policy of discrimination" or has engaged in "a series of allegedly discriminatory acts which are sufficiently related so as to constitute a pattern . . . ." *Id.* at 528. There are three factors to consider in determining whether an employer has been engaged in a series of allegedly discriminatory acts:

> "The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (*e.g.,* a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?" [*Sumner, supra* at 538, quoting

**20**

*Berry v LSU Bd of Supervisors*, 715 F2d 971, 981 (CA 5, 1983).]

Whatever the merits of the policy crafted by *Sumner*, it bears little relationship to the actual language of the relevant statue of limitations, MCL 600.5805, and MCL 600.5827. Fundamental canons of statutory interpretation require us to discern and give effect to the Legislature's intent as expressed by the language of its statutes. *DiBenedetto v West Shore Hosp*, 461 Mich 394, 402; 605 NW2d 300 (2000). If such language is unambiguous, as most such language is, *Klapp v United Ins Group Agency, Inc*, 468 Mich 459; 663 NW2d 447 (2003), "we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written." *DiBenedetto, supra* at 402.

MCL 600.5805 provides, in pertinent part:

> (1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.
>
> * * *
>
> (10) The period of limitations is 3 years after the time of the death or injury for all other actions to recover damages for the death of a person, or for injury to a person or property.

MCL 600.5827 provides that a "claim accrues at the time the wrong upon which the claim is based was done

regardless of the time when damage results."  Thus, § 5805 requires a plaintiff to commence an action within three years of each adverse employment act by a defendant. Section 5805 does not say that a claim outside this three-year period can be revived if it is somehow "sufficiently related" to injuries occurring within the limitations period.  Rather, the statute simply states that a plaintiff "shall not" bring a claim for injuries outside the limitations period.  Nothing in these provisions permits a plaintiff to recover for injuries outside the limitations period when they are susceptible to being characterized as "continuing violations."  To allow recovery for such claims is simply to extend the limitations period beyond that which was expressly established by the Legislature.[8]

---

[8] The dissent is utterly deconstructionist in its attitude toward statutes of limitations, which is its right but which attitude nonetheless bears no relationship to that of the Legislature.  We are told by the dissent, for example, that we often cannot determine when discriminatory acts have taken place, when civil rights claims have accrued or manifested themselves, whether an act of discrimination is "discrete or nondiscrete," and that even discrete acts of discrimination may not be readily identifiable.  *Post* at 12.  Doubtless, there are difficult evidentiary issues in the realm of civil rights as in most other realms of the law.  Such difficulties, however, do not constitute authorization for ignoring the express direction of the Legislature that violations of the Civil Rights Act are to *be* subject to a period of limitations, one that is 2 1/2 years longer than the federal period of limitations.  The dissent is obviously correct that the cost of a statute of limitations is that some acts of discrimination will go unredressed.  This is the cost of

An additional flaw in *Sumner's* reasoning is its unduly heavy reliance on federal case law, particularly *Evans*. While federal precedent may often be useful as guidance in this Court's interpretation of laws with federal analogues, such precedent cannot be allowed to rewrite Michigan law. The persuasiveness of federal precedent can only be considered after the statutory differences between Michigan and federal law have been fully assessed, and, of course, even when this has been done and language in state statutes is compared to similar language in federal statutes, federal precedent remains only as persuasive as the quality of its analysis. Here, not only does the "continuing violations" doctrine in Michigan conflict with the requirements of §§ 5805 and 5827, but, at least arguably, the federal doctrine is given affirmative support by language in Title VII that is absent from the Civil Rights Act. In 1972, Congress amended Title VII to extend the period within which an employee must file a complaint with the Equal Employment Opportunity Commission from 90 days to 180 days. At the same time, Congress imposed a two-year

---

*any* statute of limitations, but nonetheless a cost that the Legislature apparently believes is outweighed by the benefits of setting a deadline on stale claims. While the dissent may be correct that the "continuing violations" doctrine "better protects" the victims of discrimination, *post* at 13, and that it is a "highly workable and preferable" doctrine, *post* at 14, it is not the doctrine chosen by the Legislature.

**23**

limit on backpay awards. Thus, Congress implicitly recognized an employee's right to recover damages for discriminatory acts beyond those that occurred within the 180-day period. *Sumner* noted that such amendment constituted an "implicit endorsement of the continuing violation theory," because Congress allowed employees to recover damages for discriminatory acts beyond those that occurred within the 180-day period. *Sumner, supra* at 526. However, *Sumner* failed to note that there is no corresponding provision in Michigan law that even implicitly endorses the "continuing violations" doctrine. Thus, rather than supporting *Sumner's* holding, the existence of the federal statute leads to the opposite conclusion—that the "continuing violations" doctrine is contrary to Michigan law and, therefore, that federal precedent should not have been imported into Michigan law.[9]

Therefore, we overrule *Sumner* and hold that a person must file a claim under the Civil Rights Act within three years of the date his or her cause of action accrues, as

---

[9] We note that the United States Supreme Court recently rejected the "continuing violations" doctrine for Title VII claims with regard to discrete acts because it is contrary to the statute of limitations. *Nat'l R Passenger Corp v Morgan*, 536 US 101; 122 S Ct 2061; 153 L Ed 2d 106 (2002).

required by § 5805(10).[10]  That is, "three years" means three years.  An employee is not permitted to bring a lawsuit for employment acts that accrue beyond this period, because the Legislature has determined that such claims should not be permitted.[11]  Whether or not the "continuing

---

[10] Although we concur with the dissent that the doctrine of stare decisis constitutes the "'preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions and contributes to the actual and perceived integrity of the judicial process,'" *post* at 10-11, quoting *Robinson v Detroit*, 462 Mich 439,463; 613 NW2d 307 (2000), so also are these values promoted by the separation of powers doctrine, which holds that it is the responsibility of the judiciary to respect the intentions of the Legislature by giving faithful meaning to the words of the law.  In this case, we conclude that the values identified in *Robinson*, and invoked by the dissent, are substantially better served by restoring the law to its written meaning rather than maintaining the judicial amendments of *Sumner*.  Not only, in our judgment, are laws generally made more "evenhanded, predictable and consistent" when their words mean what they plainly say, and when all litigants are subject to the equal application of such words, but laws are also made more accessible to the people when each of them is able to read the law and thereby understand his or her rights and responsibilities. When the words of the law bear little or no relationship to what courts say the law means (as in *Sumner*), then the law increasingly becomes the exclusive province of lawyers and judges.

[11] The principal difference between the majority and the dissent in approaching the interpretative process is that the majority is content to rely on the actual words used by the Legislature while the dissent insists on ascribing its own "purpose" to the act, *post* at 17 n 6, and interpreting the act consistent with this statement of purpose, no matter what barriers to this end have been inconveniently created by the Legislature in failing to use words that serve the dissent's self-stated "purpose." While it can scarcely be gainsaid that the purpose of the

25

violations" exception of *Sumner* constitutes a useful improvement in the law, there is no basis for this Court to construct such an amendment.[12]

Accordingly, plaintiff's claims of retaliatory discrimination arising from acts occurring before June 21,

---

Civil Rights Act is to "root out discrimination and make injured parties whole," *id.*, that purpose must be understood in the context of a competing "purpose" to ensure that relief under the act be subject to a statute of limitations. While the dissent apparently views a statute of limitations as compromising the act's "purpose," i.e., its *own* characterization of such purpose, we believe that it is better understood as requiring a more precise and fine-tuned statement of the act's purpose, one predicated on the intentions of the Legislature rather than on the preferences of the dissent. The words of any statute can be effectively undermined by a sufficiently generalized statement of "purpose" that is unmoored in the actual language of the law.

[12] This Court has rejected similar attempts to modify statutes of limitations. See *Boyle v Gen Motors Corp*, 468 Mich 226, 231-232; 661 NW2d 557 (2003) (rejecting application of the discovery rule to extend the statute of limitations in fraud cases); *Secura Ins Co v Auto-Owners Ins Co*, 461 Mich 382, 387-388; 605 NW2d 308 (2000) (holding that the doctrine of judicial tolling cannot be applied in the absence of statutory language permitting such tolling); *Magee v DaimlerChrysler Corp*, 472 Mich 108, 113; 693 NW2d 166 (2005) (noting that the "continuing violations" doctrine "renders nugatory the period of limitations established by the Legislature in MCL 600.5805[10]"). While the judicial temptation to relax a statute of limitations may be understandable in the context of a lawsuit in which a plaintiff, alleging that he or she has suffered a serious wrong, has been denied his or her day in court, the costs involved in terms of undermining the clarity and predictability of the law, allowing stale complaints to proceed, and injecting uncertainty into a myriad of legal relationships, are considerable, not to mention that a court that does so would be exercising "legislative," not "judicial," power. See Const 1963, art 3, § 2; art 4, § 1; art 6, § 1.

1992, are untimely and cannot be maintained. Without these untimely acts, plaintiff's claim is limited to acts occurring five to eleven years[13] after she filed her grievance. In light of this gap, there is insufficient evidence to allow a reasonable juror to find a causal link between the 1987 grievance and the discriminatory acts falling within the limitations period.[14]

---

[13] The first actionable claim in 1992 is five years after plaintiff's 1987 national-origin grievance and plaintiff claims that she was treated poorly up to the date of the 1998 trial, which was eleven years after the grievance was filed.

[14] Notwithstanding our overruling of *Sumner*, the dissent, unlike the majority, would still allow acts falling outside the period of limitations to be admissible "'as background evidence in support of a timely claim.'" *Post* at 19, quoting *Morgan*, *supra* at 113. The dissent would enable a plaintiff to claim that an adverse employment action occurring outside the limitations period constituted evidence that the employer is committing current violations. Such an understanding would essentially resurrect the "continuing violations" doctrine of *Sumner* through the back door. It would bar an employee from *directly* recovering for untimely acts of discrimination, but allow the employee to *indirectly* recover for the same acts. What practical difference is there between the *Sumner* rule, which states that acts of discrimination that might otherwise be viewed as stale are cognizable under the act if they are part of a "continuing violation," and the dissent's rule that would allow stale violations to be considered "as evidence" of the actionable violation? The premises of the dissent and of *Sumner* are indistinguishable in that there can be no "discrete" acts of discrimination, but that such acts must always be assessed in a continuing context so that we can never know when an "injury" for statute of limitations purposes has occurred. The dissent's rule is as inconsistent with the Civil Rights Act as the "continuing violations" doctrine of *Sumner*, and equally incompatible with the rationale for a

27

Furthermore, in order to show causation in a retaliatory discrimination case, "[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003). There is no evidence to suggest any distinction between the promotion denial that occurred while plaintiff was in Cathcart's chain of command and those denials involving supervisors who had no knowledge of plaintiff's grievance. Five supervisors, including four who were directly responsible for postgrievance promotion decisions involving plaintiff, testified that they were unaware that plaintiff had filed any grievance. Plaintiff failed to introduce any evidence to contradict that testimony. However, despite the First North supervisors' lack of knowledge about the grievance, they treated her requests for promotions in the same manner that Cathcart did, i.e., they denied them. Because these supervisors were not aware of the grievance, they could not have "retaliated" against plaintiff for its filing. Further, there is no evidence that plaintiff's job qualifications changed in any meaningful way in the time

statute of limitations. See *Nielsen v Barnett*, 440 Mich 1, 8-9; 485 NW2d 666 (1992). It would allow the plaintiff to resuscitate stale claims—in this case claims more than a decade old—and require a defendant to defend against such claims in the face of the passage of time, fading memories, and the loss of witnesses and evidence.

between the denial by Cathcart and the denials by the other supervisors at First North. Thus, a juror could not reasonably conclude that the reasons behind the denials within First North were related to the grievance.

Plaintiff has failed to produce evidence affirmatively showing, as is her burden, that the reasons underlying the promotion denial involving Cathcart were any different from the denials involving supervisors who were unaware that plaintiff had filed a grievance. *West*, *supra* at 183-184; *DeFlaviis*, *supra*. It appears that both the trial court and the Court of Appeals identified a "causal connection" between the grievance and the promotion denials simply on the basis of timing—that is, because the denials occurred after the grievance, there must be a functional relationship. This is the kind of *post hoc, ergo propter hoc* reasoning rejected in *West*. We reject such reasoning in this case as well.

Similarly, plaintiff failed to establish that she was treated poorly by Cathcart and the First North supervisors *as a result of* the grievance. Plaintiff was unable to establish that Cathcart's treatment of plaintiff was

**29**

distinguishable in any way from her treatment by supervisors who were unaware of the grievance.[15]

First, plaintiff claimed that Cathcart treated her differently from other employees by refusing to give her a key to the facility. However, her supervisor at First North, who denied any knowledge of the grievance, similarly refused to give plaintiff a key. Second, plaintiff claimed that her work was subjected to greater scrutiny by Cathcart than that of her coworkers. However, she also claimed that another First North supervisor, who is no longer an employee of defendant and did not testify, wrote her several memos a day "unfairly attacking" her performance. Finally, both plaintiff and the Court of Appeals found it noteworthy that she was moved to a "disgusting" office after the transfer to First North. However, the supervisor who assigned her that office testified that he was unaware of the grievance and had informed her that it was only a temporary situation. Under these circumstances, we conclude that no juror could have reasonably concluded that plaintiff was subjected to poor treatment *because* she had

---

[15] In fact, Cathcart testified that he did not remember, and would not have been troubled by, the grievance. Further, plaintiff admitted that, during the period of alleged poor treatment, Cathcart intervened on her behalf when another supervisor sought to change her work hours.

been engaged in "protected activity" by filing a grievance claiming national-origin discrimination.

Finally, plaintiff has failed to demonstrate that Cathcart's alleged derogatory comments based on national origin establish any causal connection between the grievance and the adverse employment action. In order to establish such a connection, plaintiff needed to show that the comments demonstrated Cathcart's discriminatory animus toward her and that, as a result of such animus, Cathcart retaliated against her for filing the grievance.

Plaintiff claims that Cathcart made a racially derogatory statement regarding Indians.[16] Plaintiff testified that Cathcart responded to the news that her son had been admitted to a medical program by stating, "I don't know how many Indian doctors we need."[17] This statement does not pertain in any way to the promotion process; neither is it directed toward plaintiff in terms of evaluating her

---

[16] Cathcart allegedly made another racially derogatory statement regarding Indians in 1989; however, it is outside the limitations period. We also note that Cathcart allegedly made two statements concerning African-Americans. These seem to have little bearing in this case because plaintiff is not African-American. Further, one of these statements occurred at least two years before plaintiff's grievance regarding national-origin discrimination and the other occurred approximately nine years afterward.

[17] While plaintiff did not indicate when this statement was made, a juror could infer that it was made sometime between 1992 and 1995.

work performance or threatening any future treatment of her. See *Sniecinski*, *supra* at 136 n 8. However inappropriate or ill-informed this statement, it is better characterized, in our judgment, as a "stray comment" than as reflective of any "pattern of biased comments . . . ."[18] *Id*.

More to the point, for the same reason that plaintiff here has failed to demonstrate that Cathcart's treatment of her did not vary in any appreciable way from her treatment by other supervisors—concerning whom there is no evidence of even such "stray comments"—we do not believe that plaintiff has demonstrated that she was subjected to denials of promotions or otherwise poor treatment by defendant *on the basis of* her grievance. Again, we reiterate that the question is not the propriety or seemliness of Cathcart's statements, but merely whether such statements establish a causal link between plaintiff's grievance and her subsequent treatment by defendant.

In light of insufficient evidence that plaintiff was not promoted or otherwise treated poorly because she engaged in a "protected activity," i.e., having filed a grievance against defendant alleging national-origin

---

[18] This conclusion is underscored by the fact that the jury, after learning of all these statements, concluded that plaintiff had not been discriminated against on the basis of national origin.

discrimination, plaintiff has failed to establish a retaliation claim under the Civil Rights Act.

## IV. Conclusion

We conclude that the "continuing violations" doctrine is contrary to the language of § 5805 and hold, therefore, that the doctrine has no continued place in the jurisprudence of this state. Accordingly, *Sumner* is overruled. Further, we conclude that there is insufficient evidence to support plaintiff's claims of retaliation based on her opposition to sexual harassment and those acts by her employer following the grievance that were within the statutory limitations period. Accordingly, we reverse the judgment of the Court of Appeals and remand the matter to the trial court for entry of judgment in favor of defendant.

> Stephen J. Markman
> Clifford W. Taylor
> Maura D. Corrigan
> Robert P. Young, Jr.

33

S T A T E   O F   M I C H I G A N

SUPREME COURT

SHARDA GARG,

    Plaintiff-Appellee/Cross-Appellant,

v                                   No. 121361

MACOMB COUNTY COMMUNITY MENTAL HEALTH SERVICES,

    Defendant-Appellant/Cross-Appellee.

_____

CAVANAGH, J. (*dissenting*).

I agree with the majority's conclusion that there was insufficient evidence of retaliation based on plaintiff's alleged opposition to the sexual harassment of her co-workers.

I disagree with the majority's conclusion that plaintiff presented insufficient evidence that she was retaliated against for filing a grievance. Moreover, I disagree with the majority's decision to overrule *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505; 398 NW2d 368 (1986), and abolish the continuing violations doctrine. Finally, I disagree with the majority's rationale that because the continuing violations doctrine no longer applies, evidence of prior acts must necessarily be excluded from consideration. Accordingly, I must respectfully dissent.

## I. Plaintiff Presented Sufficient Evidence of Retaliation for Filing a Grievance

The Michigan Civil Rights Act "is aimed at 'the prejudices and biases' borne against persons because of their membership in a certain class, and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases." *Miller v C A Muer Corp*, 420 Mich 355, 363; 362 NW2d 650 (1984) (citations omitted). To this end, the Civil Rights Act, MCL 37.2701, provides in pertinent part:

> Two or more persons shall not conspire to, or a person shall not:
>
> (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

The Court of Appeals has observed that the purposes of the retaliation provisions of the act are "to protect access to the machinery available to seek redress for civil rights violations and to protect operation of that machinery once it has been engaged." *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 440; 566 NW2d 661 (1997) (citation omitted).

This Court has yet to formally delineate the prima facie elements of a retaliation claim under the Michigan Civil Rights Act. The Court of Appeals, however, has

relied on federal precedent to formulate its own test. Today, the majority adopts the Court of Appeals test as its own. See *ante* at 10-11. Thus, to establish a prima facie case of unlawful retaliation under the Civil Rights Act, a plaintiff must show: "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *DeFlaviis*, *supra* at 436, citing *Polk v Yellow Freight Sys, Inc*, 876 F2d 527, 531 (CA 6, 1989), *Booker v Brown & Williamson Tobacco Co, Inc*, 879 F2d 1304, 1310 (CA 6, 1989), and *Kroll v Disney Store, Inc*, 899 F Supp 344, 348 (ED Mich, 1995). Using these elements, I would conclude that the trial court properly denied defendant's motion for judgment notwithstanding the verdict (JNOV) on plaintiff's claim that she was retaliated against for filing a grievance against her supervisor.

As noted by the majority, the first two elements of the test are satisfied because plaintiff engaged in protected activity and defendant was aware that plaintiff had engaged in this activity. See *ante* at 17. Moreover, I would conclude that sufficient evidence was presented on the third and fourth elements; namely, there was sufficient

evidence that defendant took adverse employment action against plaintiff and there was a causal connection between the filing of the grievance and the adverse employment action. With regard to these elements, I find the Court of Appeals characterization of the evidence persuasive. The Court of Appeals noted:

> [P]laintiff sufficiently established the elements of a retaliation claim by way of her evidence that (1) plaintiff filed a grievance alleging racial discrimination in June 1987; (2) Cathcart, a supervisor, knew about the grievance; (3) after filing the grievance, plaintiff failed to receive the next promotion that she sought, posted in December 1988, despite being qualified for the position; (4) plaintiff failed to receive seven total promotions between 1989 and 1997, despite being qualified for the positions; (5) individuals less qualified than plaintiff received promotions while plaintiff did not; (6) in 1994, plaintiff was transferred to a windowless office from which she could hear noises emanating from the adjacent bathroom, while persons more senior [sic] to plaintiff received better offices; (7) in 1996, Cathcart made a statement disparaging to blacks; (8) Cathcart made another comment disparaging to Indians; (9) Cathcart reprimanded plaintiff but not others for minor infractions; (10) Cathcart ignored plaintiff in staff meetings and treated her poorly in the hallways; (11) in 1984 or 1985, Cathcart used the word "n-----" in referring to blacks; and (12) Cathcart remained in plaintiff's chain of command throughout the years. [Unpublished opinion per curiam of the Court of Appeals, issued March 29, 2002 (Docket No. 223829).][1]

---

[1] I disagree with the majority's contention that these statements should be considered mere stray remarks.

A motion for JNOV should be granted only if the evidence, viewed in the light most favorable to the nonmoving party, fails to establish a claim as a matter of law. *Orzel v Scott Drug Co*, 449 Mich 550, 557-558; 537 NW2d 208 (1995). This Court reviews de novo a trial court's decision to grant or deny a motion for JNOV, and likewise reviews the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Craig v Oakwood Hosp*, 471 Mich 67, 77; 684 NW2d 296 (2004). Under this standard, I cannot say that the evidence detailed by the Court of Appeals fails to establish a claim of retaliation as a matter of law. Moreover, while reasonable jurors could reach different conclusions, I cannot say that no reasonable juror could conclude that plaintiff was retaliated against for filing a grievance. Thus, I would hold that the trial court properly denied defendant's motion for JNOV on the retaliation theory.[2]

---

Moreover, I find wholly unpersuasive the majority's logic that the derogatory statements concerning African-Americans are irrelevant because plaintiff is Indian.

[2] As noted previously, I tend to agree with the majority that plaintiff presented insufficient evidence that she was retaliated against for her alleged opposition to the sexual harassment of her coworkers. However, I disagree with the majority's election to decide, in dictum, whether responsive physical behavior constitutes protected activity. Given the majority's ultimate conclusion, this portion of the majority's opinion is unnecessary.

5

## II. *Sumner* and the Continuing Violations Doctrine

The Michigan Civil Rights Act contains no internal statute of limitations. Nonetheless, this Court has applied the general three-year limitations period set forth in MCL 600.5805 to claims brought under the act. See, e.g., *Mair v Consumers Power Co*, 419 Mich 74; 348 NW2d 256 (1984). However, in recognition that such claims tend to "unfold rather than occur," this Court unanimously adopted a narrow exception to the statute of limitations—the continuing violations doctrine. *Sumner, supra* at 526. The continuing violations doctrine dictates that unlawful acts that occur beyond the period of limitations are actionable, as long as the acts are sufficiently related to constitute a pattern and one of the acts occurred within the period of limitations.

As noted by the *Sumner* Court, the federal courts developed the continuing violations doctrine as a narrow exception to Title VII's short limitations period. This Court detailed the reasons for the exception, reasons that still ring true today:

> These courts expressed concern with a number of factors which they felt militated against a strict application of the limitation requirement.

Moreover, although this issue was raised by the Attorney General as amicus curiae, this issue was neither raised below nor specifically briefed by the parties.

6

First, Title VII is a remedial statute whose purpose is to root out discrimination and make injured parties whole. Second, employees are generally lay people, who do not know that they must act quickly or risk losing their cause of action. An employee may fear reprisal by the employer, or may refer the matter to a union, which may not take any action within the limitation period. Employees may also delay filing their complaints in the hope of internal resolution or simply to give the employer a second chance. Third, and most importantly, many discriminatory acts occur in such a manner that it is difficult to precisely define when they took place. One might say that they unfold rather than occur. [*Id*. at 525-526.]

In light of the United States Supreme Court's decision in *United Air Lines, Inc v Evans*, 431 US 553; 97 S Ct 1885; 52 L Ed 2d 571 (1977), this Court observed that the continuing violations doctrine generally consists of two subtheories:

> The first subtheory involves allegations that an employer has engaged in a continuous policy of discrimination. In such a case, the plaintiff is alleging that "he is challenging not just discriminatory conduct which has affected him, but also, or alternatively, the underlying employment system which has harmed or which threatens to harm him and other members of his class."

> The second subtheory, the "continuing course of conduct" or "series of events" situation is relevant where an employee challenges a series of allegedly discriminatory acts which are sufficiently related so as to constitute a pattern, only one of which occurred within the limitation period. [*Sumner*, *supra* at 528 (citations omitted).]

Here, plaintiff is alleging that defendant retaliated against her through a continuing course of conduct. Thus, the second subtheory applies to this case.

In determining whether a continuing course of conduct exists under the second subtheory, this Court adopted the approach set forth by the Fifth Circuit Court of Appeals:

> "The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (*e.g.*, a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?" [*Sumner*, *supra* at 538, quoting *Berry v LSU Bd of Supervisors*, 715 F2d 971, 981 (CA 5, 1983).]

Under these circumstances, I would conclude that the continuing violations doctrine applies to plaintiff's retaliation claim. First, the acts involve the same type of continuing violation: repeated denials of promotions and disparate treatment in retaliation for engaging in protected activity. Second, defendant's acts occurred with frequency: plaintiff was consistently denied every promotion she applied for from the date the grievance was

8

filed. Finally, on these facts, the consistent denials of promotions and disparate treatment did not have the degree of permanence that would necessarily preclude application of the continuing violations doctrine. Plaintiff did not suspect that the impetus for the adverse actions was the filing of the grievance until much later. While retaliatory conduct may be considered a discrete act under some circumstances, the facts of this case demonstrate that retaliation is often just as subtle and hard to detect as discrimination. Thus, I would apply the continuing violations doctrine and conclude that all the adverse employment actions taken by defendant against plaintiff are actionable.

### III. The Majority's Decision to Overrule *Sumner*

The majority reasons that *Sumner* and the continuing violations doctrine have no place in Michigan law because they bear little relationship to the actual language of MCL 600.5805 and 600.5827. Rather, MCL 600.5805 "requires a plaintiff to commence an action within three years of each adverse employment act by a defendant. . . . Nothing in these provisions permits a plaintiff to recover for injuries outside the limitations period when they are susceptible to being characterized as 'continuing violations.'" *Ante* at 22-23. Moreover, the majority

9

concludes that *Sumner* "unduly" relied on federal case law. *Id.* at 23. According to the majority, the continuing violations doctrine is arguably given support by the language of Title VII, unlike the language of Michigan's statutory provisions. Additionally, Congress amended Title VII to impose a two-year limit on recovering back pay and, thus, implicitly endorsed the doctrine. The majority posits that there is no corresponding provision in Michigan law that even implicitly endorses the continuing violations doctrine. Accordingly, the majority overrules *Sumner* and holds that a person must file a claim under the Civil Rights Act within three years of the date his or her cause of action accrues.

"[T]his Court has consistently opined that, absent the rarest circumstances, we should remain faithful to established precedent." *Brown v Manistee Co Rd Comm*, 452 Mich 354, 365; 550 NW2d 215 (1996). The doctrine of stare decisis is "'the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000) (citation omitted). The current Court has detailed four principles to consider before

10

established precedent is overruled: "(1) whether the earlier case was wrongly decided,[3] (2) whether the decision defies 'practical workability,' (3) whether reliance interests would work an undue hardship, and (4) whether changes in the law or facts no longer justify the questioned decision." *Pohutski v City of Allen Park*, 465 Mich 675, 694; 641 NW2d 219 (2002). In my view, none of these factors weighs in favor of overruling *Sumner* and abolishing the continuing violations doctrine.

First, I cannot say that *Sumner* was wrongly decided. Like its federal counterpart, the Civil Rights Act "is a remedial statute whose purpose is to root out discrimination and make injured parties whole." *Sumner*, *supra* at 525. Because the Civil Rights Act is remedial in nature, it should be liberally construed. *Kassab v Michigan Basic Prop Ins Ass'n*, 441 Mich 433, 467; 491 NW2d 545 (1992) (Cavanagh, C.J., dissenting); see also *Kassab*, *supra* at 451 (Mallett, J., dissenting).

In *Sumner*, *supra* at 526, this Court astutely observed that "many discriminatory acts occur in such a manner that it is difficult to precisely define when they took place."

---

[3] Is not this "principle" a given? As I have noted previously, it would seem strange indeed for a "correctly decided" decision to be trashed.

11

Indeed, determining when a claim accrues or occurs is surprisingly difficult because violations of the act may not manifest themselves except at the end of a lengthy period. Whether a particular act is discrete or nondiscrete often depends on the circumstances of the individual case. And even so-called discrete acts may not always be readily identifiable. In fact, the United States Supreme Court recently left open the question whether discriminatory employment actions are subject to some sort of discovery rule. The Court noted that

> [t]here may be circumstances where it will be difficult to determine when the time period should begin to run. One issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered. But this case presents no occasion to resolve that issue. [*Nat'l R Passenger Corp v Morgan*, 536 US 101, 114 n 7; 122 S Ct 2061; 153 L Ed 2d 106 (2002).]

The continuing violations doctrine remains a salutary tool because, as a practical matter, it may be difficult to determine when a violation of the act was committed or when a civil rights claim accrues for purposes of MCL 600.5827.[4]

---

[4] MCL 600.5827 provides:

Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues. The claim accrues at the time provided in sections 5829 to 5838, and in cases not covered by these sections the claim

12

Simply stated, a victim of discrimination may not be aware that he or she is being or has been discriminated against until after the period of limitations has expired. The continuing violations doctrine better protects the victim and does not reflexively give the discriminating party the benefit of judicial hindsight. However, the *Sumner* Court was careful to explain that not every prior act will be actionable under the continuing violations doctrine. Even though discriminatory acts may be difficult to ascertain, the continuing violations doctrine will not apply if there is not a pattern, the acts do not involve the same subject matter, the acts do not occur with frequency, or the plaintiff should have been aware that his or her rights under the act were being violated. In my view, *Sumner* remains a sound decision because it seeks to ameliorate the effects of strictly applying the limitations period where it is difficult to ascertain exactly when a civil rights claim accrues.

Second, *Sumner* does not defy practical workability. As noted above, just the opposite is true. Because it is often extremely difficult to ascertain when a claim accrues, application of the continuing violations doctrine

---

accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.

13

proceeds on a case-by-case basis. The doctrine is generally analyzed under two distinct subtheories and this Court has set forth a clear three-factor test to assist courts in determining whether a continuing course of discriminatory conduct exists. *Sumner*, *supra* at 538. In my view, *Sumner* remains a highly workable and preferable decision.

Third, overruling *Sumner* would work an undue hardship because of the reliance interests placed on that decision. *Sumner* has been entrenched in this state's jurisprudence for nearly twenty years. Further, as a practical matter, the continuing violations doctrine encourages lay employees, who may not be supremely confident that their rights are being violated, to seek internal resolution of their suspected complaints. Needless to say, such a course of action is advantageous to all persons involved. In reliance on *Sumner*, an employee could rest assured that possible violations of the Civil Rights Act would not become stale while attempting to resolve the complaint internally. Moreover, employees' fear of reprisals by employers was greatly diminished because of *Sumner*'s safeguards. Because of *Sumner*, both employees and employers were relieved of the burden of being on "litigation watch" at the first sign of trouble. Employees

and employers have relied on *Sumner* for quite some time and conducted their affairs and operations accordingly.

In my view, affirming the principles announced in *Sumner* would work far less of a hardship than overruling that decision. Indeed, opponents of the continuing violations doctrine should be careful what they wish for. Overruling *Sumner* may actually encourage employees to run to court at the first sign of trouble. This will put a strain on everyone involved in the process—the employee, the employer, and the courts. Such inherent tension was alleviated by *Sumner* and the continuing violations doctrine. Thus, because the citizens of this state have justifiably relied on *Sumner* for nearly two decades and overruling that decision would unnecessarily disrupt these reliance interests, I would refrain from overruling *Sumner*.

Fourth and finally, there has been no change in the law or facts that has cast doubt on the wisdom of *Sumner*. Indeed, this Court has consistently cited and suggested that *Sumner's* reliance on federal precedent was warranted. See, e.g., *Chambers v Trettco, Inc*, 463 Mich 297, 313; 614 NW2d 910 (2000) ("We are many times guided in our interpretation of the Michigan Civil Rights Act by federal interpretations of its counterpart federal statute. See, e.g., *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505,

15

525; 398 NW2d 368 (1986).")[5]  Thus, there has been no seismic shift, except for the makeup of this Court, that would warrant overruling *Sumner* and abolishing the continuing violations doctrine.

In sum, I disagree with the majority's decision to overrule *Sumner*.  I believe that the continuing violations doctrine remains a venerable approach to analyzing claims brought under the Michigan Civil Rights Act.[6]

----

[5] See also *Radtke v Everett*, 442 Mich 368, 381-382; 501 NW2d 155 (1993) ("While this Court is not compelled to follow federal precedent or guidelines in interpreting Michigan law, this Court may, 'as we have done in the past in discrimination cases, turn to federal precedent for guidance in reaching our decision.' *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505, 525; 398 NW2d 368 (1986)."); *Stevens v McLouth Steel Products Corp*, 433 Mich 365, 375; 446 NW2d 95 (1989) ("This Court has frequently drawn from federal court precedent in interpreting other aspects of the Civil Rights Act.  See, e.g., *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505, 525; 398 NW2d 368 (1986) . . . .").

[6] The majority posits that my conclusion to reaffirm the principles announced in *Sumner* stems from my preference to interpret the Civil Rights Act in harmony with my "own," "self-stated" "characterization" of the purpose of the act. *Ante* at 26-27 n 11.  As detailed in *Sumner*, *supra* at 525, the purpose of the act is "to root out discrimination and make injured parties whole."  In the same footnote, however, the majority acknowledges that *Sumner*'s stated purpose of the act is undeniable.  Nonetheless, the majority concludes that this undeniable purpose must heed another "competing" purpose—"to ensure that relief under the act be subject to a statute of limitations." *Ante* at 27 n 11.  Accordingly, the majority would "fine-tune" the act's undeniable purpose and restate the "precise" purpose of the Civil Rights Act as follows: to intermittently root

16

## IV. The Majority's Application of its New Rule is Fundamentally Flawed

Even assuming the continuing violations doctrine no longer pertains, the majority's additional reasoning cannot withstand scrutiny. Under the continuing violations doctrine, unlawful acts that occur beyond the period of limitations are *actionable*, as long as the acts are sufficiently related to constitute a pattern and one of the acts occurred within the period of limitations. The majority properly acknowledges this point of law.[7] Thus, the natural consequence of overruling *Sumner* and abolishing the continuing violations doctrine is that acts occurring beyond the period of limitations are no longer *actionable*.

---

out discrimination and make injured parties somewhat whole. I prefer the undeniable purpose previously articulated by this Court because it is more consistent with the Legislature's intent. While the majority claims that the words of any statute can be undermined by considering the statute's purpose, today's decision demonstrates that the opposite proposition is equally true. Namely, a remedial statute can be tortured by a preference to ignore, not effectuate, *the Legislature's* purpose in enacting the statute.

[7] "Nothing in these provisions permits a plaintiff *to recover for injuries* outside the limitations period when they are susceptible to being characterized as 'continuing violations.' To allow *recovery* for such claims is simply to extend the limitations period beyond that which was expressly established by the Legislature." *Ante* at 23 (emphasis added). "An employee is not permitted *to bring* a *lawsuit* for employment acts that accrue beyond this period, because the Legislature has determined that such claims should not be permitted." *Id.* at 26 (emphasis added).

Yet the majority goes even further and reasons that evidence of acts occurring outside the period of limitations must be excluded.[8]  Such a conclusion is fundamentally flawed.

For example, in *Morgan*, *supra* at 105, the United Stated Supreme Court held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period."[9]  While I disagree with the *Morgan* Court's holding, it is important to observe the Court's subsequent rationale.  In light of

---

[8] "[W]e conclude that, *once evidence of acts that occurred outside the statute of limitations period is removed from consideration*, there was insufficient evidence of retaliation based on either plaintiff's alleged opposition to sexual harassment or her filing of a grievance . . . ."  *Ante* at 1-2 (emphasis added).  "We conclude that, *absent evidence of these acts*, there is insufficient evidence to establish a causal link between the 1987 grievance and any retaliatory acts occurring within the limitations period."  *Id*. at 18 (emphasis added).

[9] However, I must note that the *Morgan* Court held that the continuing violations doctrine still applies to hostile work environment claims.  "We also hold that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible *for the purposes of assessing liability*, so long as any act contributing to that hostile work environment takes place within the statutory time period."  *Id*. (emphasis added).  Here, the majority does not attempt to exercise the same degree of prudence and reason.  Rather, the majority simply concludes that all claims brought under the Civil Rights Act, whether premised on discrete or nondiscrete acts, are subject to the statute of limitations.

its holding, the *Morgan* Court noted, "As we have held, however, this time period for filing a charge is subject to equitable doctrines such as tolling or estoppel." *Id*. at 113. Importantly, the Court also reasoned, *"Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim."* *Id*. (emphasis added). This rationale comports with the natural consequences of abolishing the continuing violations doctrine: prior acts outside the period of limitations are not *actionable* (i.e., cannot serve as the basis for imposing liability), but these acts may still be used as background evidence to support a timely claim. Thus, the majority's conclusion that acts occurring outside the limitations period must be "removed from consideration" is unacceptable. *Ante* at 2.

I disagree with the majority's stated conclusion that evidence of acts occurring outside the limitations period must be "removed from consideration" because, as a practical matter, such evidence often must be considered, as the majority's rationale confirms. While certainly not a novel approach, I believe that it is entirely proper to examine relevant evidence even though such evidence may itself not be actionable. Stated differently, the decision whether to admit certain evidence is within the trial

19

court's sound discretion and will not be disturbed absent an abuse of discretion. See, e.g., *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003). Therefore, even though so-called untimely acts may not be *actionable* under the majority's approach, such acts may be considered as relevant background evidence in most instances. In my view, the majority misunderstands the consequences of overruling *Sumner*.

In response, the majority claims that the United States Supreme Court's rationale in *Morgan* "essentially resurrect[s] the 'continuing violations' doctrine through the back door." *Ante* at 28 n 14. The majority moans that consideration of background evidence would allow an employee to indirectly recover for past acts. The majority, transfixed with destroying every shred of the additional protections afforded by the continuing violations doctrine, has lost sight of the bigger picture. The majority admittedly fails to see the practical difference between the *Sumner* rule and the logic employed by the *Morgan* Court. I would simply urge reexamination of these opinions because the differences are quite clear.

The United States Supreme Court concluded that the result of abolishing the continuing violations doctrine is that untimely claims are not actionable, period.

Inexplicably, however, the majority feels compelled to conclude that any evidence that may have once constituted a claim under the Civil Rights Act, but is now barred by the statute of limitations, may never be admitted. But, again, this is not the majority's decision to make. If the trial court determines that evidence of the now time-barred claim is relevant to the timely claim, such evidence may be admitted as background evidence, but may not serve as the basis for any damage award. Sometimes the time-barred claim will not be relevant and the trial court may conclude that such background evidence is unnecessary. In other instances, the trial court may exercise its sound discretion and admit such evidence. The majority, however, oversteps its bounds when it concludes that such evidence may never be relevant and, therefore, may never be considered. I do not know how the *Morgan* decision could make this point of law any clearer.

In sum, I believe that the majority's resolve to dismantle the continuing violations doctrine has led it to an illogical result. The majority is essentially arguing that, in *Morgan*, the United States Supreme Court attempted to resurrect the continuing violations doctrine after having overruled the doctrine. This argument makes no sense. Rather, I believe that the *Morgan* Court properly

acknowledged that overruling the continuing violations doctrine means that untimely claims are not actionable, but, in some instances, the trial court may determine that evidence of these untimely claims may be admissible to provide necessary context.

## V. Conclusion

I would hold that plaintiff presented sufficient evidence for a reasonable juror to conclude that she was retaliated against for filing her grievance. Moreover, I would affirm the principles announced in *Sumner*, and apply the continuing violations doctrine to plaintiff's claim of retaliation based on the grievance theory. Finally, even if I were to agree with the majority that the continuing violations doctrine is no longer viable, the natural consequence of abolishing that doctrine is not to exclude untimely acts from consideration. Rather, abolishing the continuing violations doctrine simply means that untimely acts are not actionable.[10]

> Michael F. Cavanagh
> Marilyn Kelly

---

[10] In light of the majority's resolution of this case, I too do not reach the other issues raised on appeal or in plaintiff's cross-appeal.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

SHARDA GARG,

    Plaintiff-Appellee/Cross-Appellant,

v                                                              No. 121361

MACOMB COUNTY COMMUNITY HEALTH SERVICES,

    Defendant-Appellant/Cross-Appellee,

and

LIFE CONSULTATION CENTER,

    Defendant.

_____

WEAVER, J. (*dissenting*).

I agree with the reasoning and conclusions of Justice Cavanagh's dissenting opinion. This Court unanimously adopted the continuing violations doctrine in *Sumner v Goodyear Tire & Rubber Co,* 427 Mich 505; 398 NW2d 368 (1986). Justice Brickley authored *Sumner,* and was joined by Justices Cavanagh, Levin, and Archer. Justice Riley, joined by Justice Boyle, concurred in the adoption of the doctrine, but disagreed with the majority's application of it to the facts of the case. Chief Justice Williams, in a separate opinion, also concurred in the adoption of the doctrine. I am not persuaded that the adoption of the

doctrine was unwarranted or that, after nineteen years, the doctrine should be abandoned.

Elizabeth A. Weaver
Marilyn Kelly
